JOHN R. O'GORMAN
    Texas Bar No. 24121292; jogorman@ftc.gov
LUIS GALLEGOS
    Oklahoma Bar No. 19098; lgallegos@ftc.gov
REID TEPFER
    Texas Bar No. 24079444; rtepfer@ftc.gov

Federal Trade Commission
1999 Bryan St., Suite 2150
Dallas, TX 75201
Phone: (202) 758-7704 (O'Gorman)
Fax: (214) 953-3079

*Attorneys for Federal Trade Commission*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>   Plaintiff,<br><br>     v.<br><br>SUPERIOR SERVICING LLC, a limited liability company; and<br><br>DENNISE MERDJANIAN, aka Dennise Correa, individually and as managing member of SUPERIOR SERVICING LLC,<br><br>   Defendants. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF**<br><br>**FILED UNDER SEAL** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.    The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, Section 521 of the Gramm-Leach-Bliley Act ("GLB Act"), 15. U.S.C. § 6821, and the FTC's Trade

1    Regulation Rule on Impersonation of Government and Businesses ("Impersonation Rule"), 16

2    C.F.R. Part 461.  Defendants' violations relate to their deceptive marketing and sale of student

3    loan debt relief services.  For these violations, the FTC seeks relief, including a temporary,

4    preliminary, and permanent injunction, monetary relief, and other relief, including an asset

5    freeze, the appointment of a receiver, and immediate access to the Defendants' business

6    premises, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, the

7    Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15

8    U.S.C. §§ 6101-6108, and Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a).

9                                   **SUMMARY OF THE CASE**

10        2.    Defendants Superior Servicing LLC and Dennise Merdjanian (collectively,

11    "Defendants") operate an unlawful debt relief scheme that preys on consumers with student loan

12    debt.  Defendants have seized on consumers' anxiety arising from the end of a three-year pause

13    in federal student loan payments, claiming that they can help consumers erase their student-loan

14    debt.  In fact, Defendants take hundreds of dollars from consumers in illegal advance payments

15    in exchange for virtually nothing, often leaving consumers even further in debt.

16        3.    Defendants' deceptive practices begin with the delivery of a mailer that, based on

17    its contents and appearance, leads consumers to believe it has been sent by a government agency

18    or a government-affiliated student-loan servicer.  The mailer lures consumers into calling

19    Defendants by promising savings of thousands of dollars a year through interest rate reductions,

20    lower monthly payments, and loan forgiveness.  On the phone, Defendants' representatives

21    confirm consumers' beliefs that Defendants are a government agency or a government-affiliated

22    student loan servicer.  Defendants then represent that they will enroll consumers in a federal

23    student debt relief program that will reduce their monthly payments to $49 and, after making

24    these payments to Defendants for several years, will forgive consumers' student loan balance.

4.      Defendants collect an initial advance fee of up to $899, in some cases representing that it will go towards the consumer's student loan balance.  Defendants further represent that the monthly $49 payments will also pay down their balances.

5.      In fact, Defendants do not provide the benefits they promise.  They do not enroll consumers in federal debt relief programs, reduce or eliminate their student loan payments or balance, or apply payments to consumers' loans.  And because Defendants often misrepresent themselves as loan servicers, consumers cease payments to their actual servicers, often at the explicit direction of Defendants.  As a result, consumers are left in even more debt.  Meanwhile, Defendants collect hundreds of dollars—in some cases over $1,000—in illegal advance fees from consumers.  The FTC brings this action to put a stop to Defendants' illegal scheme.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

7.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3), and (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFF

8.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.  The FTC also enforces Section 521(a) of the GLB Act, 15 U.S.C. § 6821, which prohibits any person

1  from obtaining or attempting to obtain customer information of a financial institution relating to

2  another person by making a false, fictitious, or fraudulent statement or representation to a

3  customer of a financial institution.  Additionally, the FTC promulgated and enforces the

4  Impersonation Rule, 16 C.F.R. Part 461, which prohibits the impersonation of government,

5  businesses, and their officials or agents in interstate commerce.

6                                          **DEFENDANTS**

7          9.      Superior Servicing LLC ("Superior Servicing") is a Nevada limited liability

8  company.  Superior Servicing transacts or has transacted business in this District and throughout

9  the United States.  At all times relevant to this Complaint, acting alone or in concert with others,

10  Superior Servicing has advertised, marketed, distributed, or sold student loan servicing and debt

11  relief services to consumers throughout the United States.

12         10.     Defendant Dennise Merdjanian, also known as Dennise Correa ("Merdjanian"), is

13  the managing member of Superior Servicing.  At all times relevant to this Complaint, acting

14  alone or in concert with others, she has formulated, directed, controlled, had the authority to

15  control, or participated in the acts and practices of Superior Servicing, including the acts and

16  practices described in this Complaint.  She is a signatory on Superior Servicing's bank account

17  and served as the customer contact for Superior Servicing's internet domain, payment

18  processing, and communications providers.  Defendant Merdjanian, in connection with the

19  matters alleged herein, transacts or has transacted business in this District and throughout the

20  United States.

21                                          **COMMERCE**

22         11.     At all times relevant to this Complaint, Defendants have maintained a substantial

23  course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

24  15 U.S.C. § 44.

**DEFENDANTS' DECEPTIVE STUDENT LOAN DEBT RELIEF OPERATION**

12.    Since at least January 2023, Defendants have operated an unlawful debt relief enterprise that preys on consumers with student loan debt.  Defendants promise loan consolidation, reduced student loan payments, and loan forgiveness in exchange for consumers' commitment to pay thousands of dollars in initial and recurring fees.  In many instances, Defendants, who represent themselves as affiliated with the government or loan servicers, convince consumers that Defendants will apply consumers' payments to their student loan balances and that Defendants will assume responsibility for servicing their student loans.  But Defendants do not deliver on their promises.  As a result, consumers often find themselves further in debt while Defendants take in hundreds of dollars in illegal advance and recurring fees—in some cases well over $1,000—from those consumers.

**Background on Student Loan Relief Programs**

13.    Student loan debt is the second largest class of consumer debt, with over 43 million borrowers owing approximately $1.74 trillion.  Student loan debt is also one of the most distressed classes of debt: roughly one in ten Americans has defaulted on a student loan, and nearly a quarter of borrowers default within their first five years of repayment.

14.    The federal government administers several student loan forgiveness and discharge programs.  These include the Income-Driven Repayment program, which provides for reduced payments and forgiveness for some consumers, and Public Service Loan Forgiveness (PSLF), which provides for forgiveness for consumers in certain public service jobs.  These programs are available only to consumers who meet specific criteria, and eligibility is judged by the government following an application process.

15.     Consumers can apply for these and other programs through the U.S. Department of Education or their student loan servicers at no cost.  These programs do not require the assistance of a third-party company or payment of application fees.

16.     In recent years, the Biden administration has attempted to implement several new, highly publicized student debt relief programs, including the cancellation of debt for hundreds of thousands of consumers and the Saving on a Valuable Education repayment plan ("SAVE Plan"), which sought to allow for the elimination of interest charges, reduction of payments to $0, or early forgiveness in some cases.

17.     Previously, the original coronavirus relief bill, the Coronavirus Aid, Relief, and Economic Security Act, signed into law in March 2020, temporarily paused payments, involuntary collections, and the accrual of interest on federally held student loans in light of the COVID-19 pandemic.  The pause ended in October 2023, and most borrowers were required to resume payments beginning that month.  To help borrowers successfully return to repayment, the U.S. Department of Education created a temporary on-ramp period through September 30, 2024, during which it would not report missed, late, or partial payments as delinquent.

18.     With the end of the COVID pause, consumers saddled with student debt have been eager to avail themselves of federal student loan relief programs.

**Defendants' Misrepresentations to Consumers**

19.     Defendants advertise, market, and sell their student loan scheme through mailers and telemarketing calls.  Through these calls or mailers, Defendants claim:

a.     Consumers who pay for Defendants' services will be enrolled in a loan repayment program that will consolidate their student loans and reduce their monthly loan payments;

b.    Consumers who pay for Defendants' services will receive loan

forgiveness;

c.    Consumers' monthly payments to Defendants will be applied towards

consumers' student loans;

d.    Defendants are affiliated with the Department of Education or its approved

loan servicers; and

e.    Defendants will assume responsibility for the servicing of consumers'

student loans.

**Defendants' Deceptive Mailers**

20.    Defendants lure consumers with deceptive mailers, as shown below. Defendants

label these mailers "**Final Notice**" in bold and purport to include a "Student Loan Consolidation

& Payment Reduction Program Prepared For" the specific consumer.  The mailer is personally

addressed to the consumer and includes a purported "BENEFIT ID" number.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



BENEFIT ID#: ▮▮▮

Address Change? Please contact our
Customer Service Department

**Final
Notice**

Contact: 866-211-4405
Assigned To: Student Loan Dept.
NOTICE DATE: 6/26/2023

Student Loan Consolidation & Payment Reduction Program Prepared For:

*NEW LAWS DISCOUNTING FEDERAL STUDENT LOANS*

Dear ▮▮▮

Do you intend to get out of the cycle of high-interest student loan debt? Our records indicate that your federal student loans may be eligible for a consolidation with the U.S. Department of Education. As a federal student loan holder, you may be eligible to convert your current high-interest loan into a federally-backed consolidation with a lower rate*. Are you willing to save thousands of dollars a year?

These government programs are based on income and family size, aimed to be as affordable as possible for each individual. Your loans in the amount of $▮▮ may even be eligible for total loan forgiveness. **What do you intend to do with the money you save? Buy your dream home? Take that much-deserved vacation?**

**Benefits of this program may include:**
• **No credit check**
• **Interest rate reduction**
• **Lower monthly payments based on income and family size**
• **Loan forgiveness**

It's time to *finally* take control of your student loan debt. Please create your Federal Student Aid ID and give our experts a call by 7/21/2023 or before your next payment is due: 866-211-4405

**CREATING YOUR FSA ID**
To create your new student FSA ID, go to the URL below to reach the Federal Aid Website. Follow the steps completely to create your ID.

**IMPORTANT:** This is a government website. FSA ID creation is a government program which the student loan department did not create.

https://nslds.ed.gov

• Step 1 – Click 'Financial Aid Review'
• Step 2 – Click 'Accept'
• Step 3 – Click 'Create an FSA ID'

Student Loan Assistance Department
866-211-4405
Monday – Friday 7:00am – 6:00pm PST

**CALL TOLL-FREE TODAY TO REDEEM YOUR FEDERAL BENEFITS: 866-211-4405
REFERENCE BENEFIT ID:** ▮▮▮

We are not affiliated with the government or any of its programs. We offer private, fee-based application assistance to aid consumers in applying for government offered programs. While such programs may be available for free directly by various government agencies, our services are fee-based and focus on application and document preparation. We do not charge fees for access to such programs, only to prepare and counsel application to these programs. Services may be fulfilled by a third party processing agency.

*The Department of Education may offer an interest rate reduction with set-up of automatic payments.

19    21.    These mailers represent that Defendants have "records" indicating the consumer

20  may be eligible for federal debt relief programs that will consolidate the recipient's high-interest

21  loans into a federally backed loan at a lower rate.

22    22.    Defendants' mailers tout the availability of "government programs" that make

23  student loans "as affordable as possible" and offer the possibility of "total loan forgiveness."

24

1    Defendants further personalize their mailers with the exact amount of student loan debt owed by

2    the recipient.

3        23.    To convince consumers to call Defendants' "experts," these mailers make bold-

4    font promises of benefits such as "**Interest rate reduction**," "**Lower monthly payments**," and

5    "**Loan forgiveness**."

6        24.    To further tout savings available to consumers, Defendants' mailers prominently

7    ask consumers, "**What do you intend to do with the money you may save? Buy your dream**

8    **home? Take that much-needed vacation?"**

9        25.    Defendants' mailers imply an affiliation with the government or the consumer's

10   then-existing loan servicer.  The mailers indicate that they have been sent by a "Student Loan

11   Dept." or a "Student Loan Assistance Department," allude to available "consolidation with the

12   U.S. Department of Education," and direct consumers to create an "FSA ID" on the Department

13   of Education's website before "REDEEM[ING] YOUR FEDERAL BENEFITS" by calling their

14   "experts" at a phone number associated with Defendants.

15       26.    Based on these representations and personal information, many consumers believe

16   that Defendants' mailer was sent by a legitimate, government-affiliated loan servicer or, in some

17   cases, by the U.S. Department of Education.  These consumers further understand that

18   Defendants are offering them debt relief services that will include loan consolidation into a

19   federally backed loan with a lower rate, lower monthly payments, and loan forgiveness.

20       27.    Defendants pressure consumers to enroll by including in each mailer fictitious

21   deadlines and language to imply urgency.  For example, "It's time to ***finally*** take control of your

22   student loan debt.  Please create your Federal Student Aid ID and give our experts a call by

23   10/6/2023 or before your next payment is due: [noting Defendants' phone number]."

24

1          **Defendants' Deceptive Representations During Telemarketing Calls**

2          28.    When consumers call in response to Defendants' deceptive mailers, Defendants'

3    telemarketers make a series of deceptive misrepresentations to induce consumers to enroll in

4    their debt relief services.

5          29.    Typically, when a consumer calls Defendants to express an interest in these

6    services, Defendants' telemarketers first ask consumers to verify their identity by confirming

7    information that includes their name, Social Security number, and loan balance.  This immediate

8    confirmation of sensitive personal information reinforces for consumers the implication that

9    Defendants are affiliated with a government agency, such as the United States Department of

10   Education, or with a loan servicer affiliated with the Department of Education.  In some

11   instances, Defendants' telemarketers expressly represent that Defendants are affiliated with a

12   government agency, such as the United States Department of Education, or with a loan servicer

13   affiliated with the Department of Education.

14         30.    After verifying their identity, Defendants ask consumers for their annual income

15   and place of employment.  Defendants represent that they need this information to determine the

16   consumers' eligibility for certain programs.

17         31.    In some instances, Defendants put consumers on hold while they ostensibly

18   confirm their eligibility for these programs. Defendants then inform consumers that they are

19   eligible.

20         32.    In many instances, Defendants assure consumers that they qualify for federal

21   student loan reduction programs, including highly publicized new initiatives that offer

22   consolidation, reduced payments, and even complete forgiveness.  In at least one instance,

23   Defendants represented that loan consolidation benefits were available to a consumer under the

24

1    SAVE Plan.  In another instance, Defendants promised a consumer that his monthly loan

2    payment would be reduced by $190 under the PSLF program.

3        33.    Defendants represent that, by enrolling in Defendants' services, consumers will be

4    enrolled in these government programs.

5        34.    In many instances, Defendants provide consumers with information about a

6    consolidation program that involves the payment of an advance fee of up to $899.  In some

7    instances, the payment is characterized as a paperwork or application fee.  In at least one

8    instance, a consumer was told that such fee would be applied toward their student loan balance.

9        35.    In addition to the advance fee, Defendants represent to consumers that the

10   consumer's monthly student loan payment will be reduced to $49 per month and that the new

11   payment will be applied toward their student loan balance.  Consumers are also told that they

12   will be making the reduced monthly payments for a period of 10 or 20 years.  This amounts to a

13   commitment of between $5,880 and $11,760 in monthly payments.

14       36.    In many instances, Defendants represent that, through the program, any remaining

15   balance on consumers' student loans will be forgiven after completing a 10- or 20-year course of

16   monthly payments.

17       37.    In many instances, Defendants represent an affiliation with the Department of

18   Education, a loan servicer affiliated with the government, or even with the consumer's then-

19   existing loan servicer.  Defendants bolster these representations at the outset of the call by

20   revealing that they already possess detailed personal information about the consumers and their

21   student loans.  Defendants' representations lead many consumers to trust that Defendants are

22   affiliated with the federal government.

23       38.    In some cases, Defendants' telemarketers explicitly represent that Superior

24   Servicing is affiliated with consumers' loan servicers.

39.    In many instances, Defendants lead consumers to believe that they will assume responsibility for servicing consumers' student loans.  In one instance, a consumer understood that "Superior Servicing was going to work with EdFinancial [his then-existing servicer] and the government to become my new loan servicer."  Another consumer reported that Defendants represented they "would work with [his then-]current lender, the credit agencies, and the government to take care of everything for [him]—all [he] had to do was make [his] reduced monthly payments."

40.    Defendants also represent that payments to Superior Servicing will be applied to their loan balances, with one consumer reporting that "[t]he representative was clear that all my payments, including the [initial] payment, would be applied towards my student loan balance."

41.    In some instances, Defendants explicitly represent that consumers should no longer make payments to their existing loan servicer.  One consumer reported that Defendants "directly told me that I would pay my student loan debt through Superior Servicing from now on and would not have to make payments to my original servicer, EdFinancial."  Another reported that Defendants confirmed that he "could stop paying [original servicer] Mohela because this would cover my monthly payments from now on."

42.    After consumers agree to enroll in Defendants' program, Defendants ask for additional information including their bank account information.  Defendants use this information, along with information already in their possession, collected on the phone, or gathered from accessing consumers' FSA accounts, to provide consumers with pre-filled contracts that require little more than a signature to execute.

43.    Defendants then rush consumers through signing the electronic contract while on the initial call, thereby preventing consumers from adequately reviewing the contract's terms.

44.     Defendants discourage consumers from reviewing the contract by sending it electronically and then pressuring them to sign before reading it.  While consumers are still on the phone with Defendants' representative, Defendants send consumers an email through a service called Clixsign.  The email contains a link to Defendants' Client Service Agreement, a Student Servicing Plan Enrollment Agreement, and a Preauthorized Checking and ACH Authorization Form (collectively, "Service Agreement").

45.     Defendants direct consumers to sign the Service Agreement, which enrolls them in their services and authorizes the payment of fees directly from consumers' bank accounts. Consumers report feeling pressured to sign the Service Agreement.  Defendants require consumers to provide debit or credit card or bank account information, including account and routing numbers, to pay for their services.  Consumers further report Defendants' representatives directing them to then sign the Service Agreement without reviewing it. They also report Defendants' representatives misrepresenting that the agreement only reiterates what the representative has told them about the program.  Consumers report signing the Service Agreement without reviewing it because they felt pressured, believed the representative, or trusted that they were working with a government entity or a government affiliated entity.

46.     Contrary to representations about the relief that enrollment will provide, buried in Defendants' 14-page Service Agreement is a statement that Defendants will provide only "document preparation and tracking of student loan relief documents."  The Service Agreement also attempts to disclaim other representations.

47.     Once in possession of consumers' private and sensitive financial information, but before securing promised debt relief, Defendants collect illegal initial advance fees of up to $899 from consumers.

48.    In addition to the initial payments, Defendants enroll each consumer in recurring monthly payments of $49 for up to 240 months, often directly debiting these payments from consumers' bank accounts.

**Defendants' Worthless Debt Relief Services**

49.    After obtaining hundreds of dollars of payments, in some cases over $1,000, Defendants do not secure the promised reduced loan payments or loan forgiveness for consumers.  They also do not assume payment of consumers' loans, nor do they apply consumers' payments to the loans.  Rather, Defendants, at most, complete forms that are available for free from the Department of Education.

50.    In many instances, Defendants email pre-filled paperwork that they instruct consumers to submit to a loan servicer.  These documents include applications for federal debt relief programs, but they also include forbearance applications that were not discussed on the phone with consumers.

51.    When a consumer's account is in forbearance, loan servicers do not notify consumers that they are not receiving payments.  Therefore, placing consumers' loans in forbearance allows Defendants to collect monthly payments without consumers learning those payments are not going to their servicers.

52.    When instructing consumers to submit paperwork to the Department of Education or an affiliated loan servicer, Defendants' instructions repeatedly advise consumers to exclude pages relating to Superior Servicing, often marking pages with a large "DO NOT MAIL THIS PAGE" watermark.  Additionally, the email containing the forms and instructions, instruct consumers to "NOT MAIL IN [THEIR] ELECTRONICALLY SIGNED SERVICE AGREEMENT."  As a result, the Defendants prevent the Department of Education from learning of their involvement.

53.     In many instances, Defendants provide consumers with incomplete forms, omitting the instruction sheets provided by the Department of Education.

54.     In some instances, the materials provided to consumers by Defendants have included expired federal forms.

55.     Contrary to Defendants' representations, Defendants are not federal loan servicers and do not take over consumers' loans.  At no point do Defendants tell consumers that they must continue to pay their loan servicer.

56.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

57.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

58.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## Count I – Deceptive Representations

59.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, Defendants represent, directly or indirectly, expressly or by implication, that:

      a.     Consumers who purchase Defendants' debt relief services will have their monthly loan repayment amounts reduced;

      b.     Consumers who purchase Defendants' debt relief services will receive loan forgiveness;

1      c.    Consumers' monthly payments to Defendants will be applied towards

2          consumers' student loans;

3      d.    Defendants are affiliated with the U.S. Department of Education or its

4          approved loan servicers; and

5      e.    Defendants will assume responsibility for servicing the repayment of

6          consumers' loans.

7      60.    Defendants' representations as described in Paragraph 59, are false or misleading,

8  or were not substantiated at the time the representations were made.

9      61.    Therefore, Defendants' representations as described in Paragraph 59 constitute

10  deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

11  **VIOLATIONS OF THE TELEMARKETING SALES RULE**

12      62.    In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and

13  deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–

14  6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended

15  certain sections thereafter.

16      63.    Defendants are "seller[s]" or "telemarketer[s]" engaging in "telemarketing" as

17  defined by the TSR, 16 C.F.R. § 310.2(ee), (gg), and (hh).  A "seller" means any person who, in

18  connection with a telemarketing transaction, provides, offers to provide, or arranges for others to

19  provide goods or services to a customer in exchange for consideration.  16 C.F.R. § 310.2(ee).  A

20  "telemarketer" means any person who, in connection with telemarketing, initiates or receives

21  telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(gg).  "Telemarketing" means

22  a plan, program, or campaign which is conducted to induce the purchase of goods or services or

23  a charitable contribution, by use of one or more telephones and which involves more than one

24  interstate telephone call.  16 C.F.R. § 310.2(hh).

64. Defendants are sellers or telemarketers of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o).  Under the TSR, a "debt relief service" means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.  16 C.F.R. § 310.2(o).

65. The TSR prohibits sellers and telemarketers from misrepresenting directly or by implication any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using the service. 16 C.F.R. § 310.3(a)(2)(x).

66. The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

    a. The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

    b. The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor; and

    c. To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

        i. Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to

Page 17 of 25

1  the entire debt amount.  The individual debt amount and the

2  entire debt amount are those owed at the time the debt was

3  enrolled in the service; or

4      ii.  Is a percentage of the amount saved as a result of the

5  renegotiation, settlement, reduction, or alteration.  The

6  percentage charged cannot change from one individual debt

7  to another.  The amount saved is the difference between the

8  amount owed at the time the debt was enrolled in the

9  service and the amount actually paid to satisfy the debt.  16

10  C.F.R. § 310.4(a)(5)(i).

11      67.  Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and

12  Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an

13  unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the

14  FTC Act, 15 U.S.C. § 45(a).  Section 19(a)(1) of the FTC Act, 15 U.S.C. § 57b(a)(1), provides

15  that the FTC may commence a civil action against "any person, partnership, or corporation" who

16  "violates any rule . . . respecting unfair or deceptive acts or practices." Section 19(b) of the FTC

17  Act, 15 U.S.C. § 57b(b), provides that in any action commenced under Section 19(a)(1), the

18  court "shall have jurisdiction to grant such relief as the court finds necessary to redress injury to

19  consumers . . . [that] may include, but shall not be limited to, rescission or reformation of

20  contracts, the refund of money or return of property."

21  **Count II – Advance Fee for Debt Relief Services**

22      68.  In numerous instances, Defendants have, in connection with the telemarketing of

23  student loan debt relief services, requested or received payment of a fee or consideration for debt

24  relief services before:

a.    Defendants have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

b.    The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor.

69.    Therefore, Defendants' acts or practices as described in Paragraph 68 violate Section 310.4(a)(5)(i) of the TSR, 16 C.F.R. § 310.4 (a)(5)(i), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count III – Material Debt Relief Misrepresentations**

70.    In numerous instances, Defendants have, in connection with the telemarketing of student loan debt relief services, misrepresented, directly or indirectly, expressly or by implication, material aspects of their debt relief services, including but not limited to, that:

a.    Consumers who purchase Defendants' debt relief services will have loan repayment amounts reduced;

b.    Consumers who purchase Defendants' debt relief services will receive loan forgiveness;

c.    Consumers' monthly payments to Defendants will be applied towards consumers' student loans;

d.    Defendants are affiliated with the U.S. Department of Education or its approved loan servicers; and

e.    Defendants will assume responsibility for servicing the repayment of consumers' loans.

71.     Therefore, Defendants' acts or practices as described in Paragraph 70 violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE GLB ACT

72.     Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November 12, 1999, and remains in full force and effect. Section 521(a) of the GLB Act, 15 U.S.C. § 6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

73.     The GLB Act defines "customer" to mean "with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary."  15 U.S.C. § 6827(1).  The GLB Act defines "customer information of a financial institution" as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of the financial institution and is identified with the customer."  15 U.S.C. § 6827(2).  The GLB Act defines "financial institution" to include "any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution."  15 U.S.C. § 6827(4)(A).

74.     Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."  Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. § 1692l(a), a violation of the FDCPA is deemed an unfair or deceptive act or practice in violation of the FTC Act.  Section 814(a) of the FDCPA further provides that all of the functions and powers of the

FTC under the FTC Act are available to the FTC to enforce compliance by any person with the FDCPA, including the power to the enforce provisions of the FDCPA in the same manner as if the violation had been a violation of an FTC trade regulation rule. Section 19(a)(1) of the FTC Act, 15 U.S.C. § 57b(a)(1), authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the GLB Act, including but not limited to the rescission or reformation of contracts, and the refund of money or return of property.

### Count IV – Use of False, Fictitious, or Fraudulent Statements to Obtain Customer Information

75.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, Defendants have made false, fictitious, or fraudulent statements or representations to customers of financial institutions to obtain or attempt to obtain customer information of a financial institution, such as bank account numbers and routing numbers, including by representing, directly or indirectly, expressly or by implication, that:

a.    Consumers who purchase Defendants' debt relief services will have loan repayment amounts reduced;

b.    Consumers who purchase Defendants' debt relief services will receive loan forgiveness;

c.    Consumers' monthly payments to Defendants will be applied towards consumers' student loans;

d.    Defendants are affiliated with the U.S. Department of Education or its approved loan servicers; and

e. Defendants will assume responsibility for servicing the repayment of consumers' loans.

76. Therefore, Defendants' acts or practices as described in Paragraph 75 violate Section 521(a) of the GLB Act, 15 U.S.C. § 6821(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TRADE REGULATION RULE ON IMPERSONATION OF GOVERNMENT AND BUSINESSES

77. The Impersonation Rule, promulgated by the FTC under Section 18 of the FTC Act, 15 U.S.C. § 57a, became effective on April 1, 2024, and remains in full force and effect. The Impersonation Rule is codified at 16 C.F.R. Part 461.

78. Part 461.2(b) of the Impersonation Rule prohibits "materially misrepresent[ing], directly or by implication, affiliation with, including endorsement or sponsorship by, a government entity or officer thereof, in or affecting commerce as commerce is defined in the Federal Trade Commission Act (15 U.S.C. 44)."

79. Part 461.3(b) of the Impersonation Rule prohibits "materially misrepresent[ing], directly or by implication, affiliation with, including endorsement or sponsorship by, a business or officer thereof, in or affecting commerce as commerce is defined in the Federal Trade Commission Act (15 U.S.C. 44)."

80. The Impersonation Rule defines "materially" to mean "likely to affect a person's choice of, or conduct regarding, goods or services." 16 C.F.R. § 461.1. The Impersonation Rule defines "government" to include "federal, state, local, and tribal governments as well as agencies and departments thereof." *Id*.

81. Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Impersonation Rule constitutes an unfair or deceptive act or practice in or affecting

commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  Section 19(a)(1) of

the FTC Act, 15 U.S.C. § 57b(a)(1), provides that the FTC may commence a civil action against

"any person, partnership, or corporation" who "violates any rule . . . respecting unfair or

deceptive acts or practices."  Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), provides that in

any action commenced under Section 19(a)(1), the court "shall have jurisdiction to grant such

relief as the court finds necessary to redress injury to consumers . . . [that] may include, but shall

not be limited to, rescission or reformation of contracts, the refund of money or return of

property."

### Count V – False Claims of Government Affiliation

82.    In numerous instances on or after April 1, 2024, in connection with the

advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services,

Defendants have materially misrepresented, directly or by implication, that they are affiliated

with the federal government, including specifically the U.S. Department of Education.

83.    Therefore, Defendants' representations as described in Paragraph 82 violate

Section 461.2(b) of the Impersonation Rule, 16 C.F.R. § 461.2(b), and Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a).

### Count VI – False Claims of Business Affiliation

84.    In numerous instances on or after April 1, 2024, in connection with the

advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services,

Defendants have materially misrepresented, directly or by implication, that Defendants were

affiliated with or endorsed by the consumer's then-existing student loan servicer.

85.    Therefore, Defendants' acts or practices as described in Paragraph 84 violate

Section 461.3(b) of the Impersonation Rule, 16 C.F.R. § 461.3(b), and Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a).

1

**CONSUMER INJURY**

2       86.    Consumers are suffering, have suffered, and will continue to suffer substantial

3 injury as a result of Defendants' violations of the FTC Act, the TSR, the GLB Act, and the

4 Impersonation Rule. Absent injunctive relief by this Court, Defendants are likely to continue to

5 injure consumers and harm the public interest.

6

**PRAYER FOR RELIEF**

7       Wherefore, the FTC requests that the Court:

8       A.     Enter a permanent injunction to prevent future violations of the FTC Act, the

9 TSR, the GLB Act, and the Impersonation Rule;

10       B.     Grant preliminary injunctive and ancillary relief as may be necessary to avert the

11 likelihood of consumer injury during the pendency of this action and to preserve the possibility

12 of effective final relief, including temporary and preliminary injunctions, an order freezing

13 assets, immediate access to Defendants' business premises, and the appointment of a receiver;

14       C.     Award monetary and other relief within the Court's power to grant, including the

15 rescission or reformation of contracts, the refund of money, or other relief necessary to redress

16 injury to consumers; and

17       D.     Award any additional relief as the Court determines to be just and proper.

18

19

20                       Respectfully submitted,

21 Dated: November 18, 2024         */s/ John R. O'Gorman*

22                       JOHN R. O'GORMAN
Texas Bar No. 24121292

23                       LUIS GALLEGOS
Oklahoma Bar No. 19098

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

REID TEPFER
Texas Bar No. 24079444

Federal Trade Commission
1999 Bryan St., Suite 2150
Dallas, TX 75201
(202) 758-7704 (O'Gorman)
(214) 979-9383 (Gallegos)
(214) 979-9395 (Tepfer)
jogorman@ftc.gov
lgallegos@ftc.gov
rtepfer@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION